# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO: 3:20-cr-37 |
| | ) | |
| vs. | ) | **REPORT AND RECOMMNEDATION** |
| | ) | **ON DEFENDANT'S MOTION TO** |
| JACOB ROBERT HOGBERG, | ) | **SUPPRESS** |
| | ) | |
| Defendant. | ) | |

**TABLE OF CONTENTS**

I.    INTRODUCTION…………………………………………………………………..…2

II.   FINDING OF FACTS…………………….…………………………………………….2

    A. TESTIMONY OF OFFICER JENKINS…...………………………………………3

    B. OFFICER JENKINS' BODY CAMERA………………………………………….6

    C. TESTIMONY OF OFFICER BECKMAN…..……………………………………8

III.  ANALYSIS...……………….…...………………………………………………………11

    A. STOP AND SEIZURE OF THE TRUCK. . . ………………..………………………11

    B. SEARCH OF THE TRUCK……..…...……………………………………………...15

    C. DEFENDANT'S STATEMENTS…..………………………………………………21

IV.   RECOMMENDATION AND ORDER………………………………………….…...26

## I.      INTRODUCTION

This matter comes before the Court pursuant to Defendant's Motion to Suppress Evidence and Statement and Request for Evidentiary Hearing (Dkt. 39) and Brief in Support (Dkt. 39-1), both filed October 5, 2020 by Jacob Hogberg ("Defendant"). The government resisted the motion on October 23, 2020. Dkt. 49. The matter was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for report and recommendation by Chief Judge John A. Jarvey. Dkt. 48. Trial is set for February 1, 2021. Dkt. 57.

An evidentiary hearing was held on November 2, 2020. Dkt. 51. The government appeared by Assistant U.S. Attorney Caleb Copley. Defendant appeared personally and with his attorney, Assistant Federal Defender Terry McAtee. Testimony was received from Burlington Police Officers Jacob Jenkins and Clayton Beckman. *Id.* The Court received two exhibits offered by the government without objection: Exhibit 1 - Body Camera Video of Officer Jenkins from the 15:30 mark, to the end of the video and Exhibit 2 – Certification of K-9 Rico. *Id.* The parties were allowed to file post-hearing briefs. *Id.* The government filed its supplemental response to Defendant's motion on November 6, 2020. Dkt. 53. On November 13, 2020, Defendant filed his reply to the government's supplemental response. Dkt. 54.

The Court considers the matter to be fully submitted. This Magistrate Judge has carefully considered the record evidence, including the exhibits admitted, the briefs filed by both parties, the arguments and statements of counsel and submits the following report. As set forth below, based on the facts presented and applicable law, it is recommended that the motion be denied.

## II.      FINDINGS OF FACT

Defendant was indicted on March 11, 2020 in Count 1 of possession with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and in Count

2 of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). These charges arose from Burlington Police Officers responding to the Super 8 Motel in Burlington, Iowa, due to a fire alarm on December 18, 2019.

### A. Testimony of Officer Jenkins

Officer Jacob Jenkins of the Burlington Police Department testified. He has been a police officer with the City of Burlington for just over four years, currently working an overnight shift in the patrol division and with experience investigating methamphetamine cases. He was on patrol on December 18, 2019 and dispatched to the Super 8 Motel in Burlington, Iowa at approximately 4:21 a.m. due to a fire alarm going off in a room at the motel. Upon his arrival at the motel, he was directed to the location of the fire alarm, Room 107, by motel staff. Officer Jenkins proceeded to Room 107 with his sergeant and fire department personnel. Officer Jenkins entered the room and found no one present. However, he did find a methamphetamine pipe in the room. Officer Jenkins testified, based on his experience, this motel is known for drug trafficking problems.

After leaving the room, Officer Jenkins moved his squad car and then proceeded to the employee area in the lobby of the motel. There he met with motel employee, Devin Eaves, who informed him Room 107 was registered to Tyler Jennings. Eaves told Officer Jenkins that Jennings had told her a vape caused the fire alarm to go off. She reported the occupants of Room 107 left the motel in a blue pickup truck before officers arrived. Officer Jenkins determined at that time Jennings had an active arrest warrant for a probation violation from Lee County, Iowa. As Officer Jenkins spoke with Eaves, Jennings called her, asking whether law enforcement was still at the motel and whether law enforcement had run his name. While watching surveillance video from the motel lobby, Officer Jenkins saw a blue pickup truck drive into the motel parking lot and park on the north side of the motel.

At this point, Officer Jenkins left the motel lobby and began walking down the main hallway in the motel, to a door leading to the north parking lot where the blue pickup truck had parked. Because he left the motel lobby immediately after seeing the truck pull in, he did not see on the surveillance video how many people may have exited the truck, nor did he see Defendant inside of the truck. His path took him past Room 107. As he approached Room 107, he encountered the Defendant, as well as Jake German. Officer Jenkins may have had a brief conversation with Defendant and German but continued proceeding outside.

Once in the north parking lot, Officer Jenkins approached the truck from the front, with another officer approaching from the rear. He found Cathy Conard in the front passenger seat and Jennings in the rear driver's side seat[1]. No one was in the driver's seat or the rear passenger side seat. Officer Jenkins knew both Jennings and Conard to be drug users. Officer Jenkins believed Jennings saw him approach, as he saw Jennings making furtive movements, on or about his person, leaning toward the waistband of his clothing. This concerned him, as he did not know what Jennings might be reaching for or doing. He directed Jennings to stop, which Jennings eventually did. Officer Jenkins took Jennings into custody on the outstanding warrant, searched him incident to arrest and found a broken methamphetamine pipe and blue container containing suspected methamphetamine residue, but no weapons. Officer Jenkins placed the methamphetamine pipe and container on the driver's seat in the truck, leaving the driver's side door open. Conard also had an active arrest warrant, was taken into custody, and searched incident to arrest.

---

[1]Officer Jenkins testified his report related to this case contains a mistake as it indicates Jennings was in the rear passenger side seat. In fact, Officer Jenkins testified he had confirmed with others in the truck the seating arrangement that evening and Defendant also confirmed he was in the rear passenger side seat.

Through investigation, Officer Jenkins learned the truck belonged to German and German drove the truck back to the motel, after leaving the first time. German was in the driver's seat, Conrad was in the front passenger seat, Jennings was in the rear driver's side seat and Defendant was in the rear passenger side seat. Officer Jenkins was informed by the others Defendant was in possession of a black instrument case[2] and a camouflage backpack when he got in the truck. These items were found on the rear passenger seat of the truck.

Officer Clayton Beckman with the Burlington Police Department was called to the scene with Rico, his K-9 partner. Officer Jenkins gave Officer Beckman a summary of what had occurred that evening and advised Officer Beckman he had placed the methamphetamine pipe and container with suspected methamphetamine residue found on Jennings on the driver's side seat in the truck. Based on the items found on Jennings, Officer Beckman had Rico perform an open-air sniff on the truck. Rico alerted and a subsequent search of the truck revealed a loaded sawed-off shotgun in the instrument case and approximately 211 grams of methamphetamine in the camouflage backpack.

After the shotgun was found, but prior to the methamphetamine being found, the decision was made to talk to the Defendant. Officer Jenkins testified the window to Room 107 was facing the area where the truck was parked. This was of concern to Officer Jenkins, as the Defendant could have been watching the whole encounter. Further, Officer Jenkins had personal knowledge about Defendant and was alerted from dispatch running Defendant's name, there was a caution for carrying weapons.[3] Officer Jenkins also had information there may have been an additional

---

[2] The case was identified as a ukulele case.
[3] Officer Jenkins indicated his knowledge came from the dispatch NCIC (National Crime Information Center) report and acknowledged Defendant did not have any convictions for weapons.

handgun in the truck which had not been found. The search of Jenkins, Conard and German had resulted in no additional weapons being found.

Officer Jenkins and Officer Beckman went to Room 107. The officers knocked on the door on two separate occasions. Defendant answered the second time and Officer Jenkins asked him if he would step outside the room to speak with them. Officer Jenkins testified no one commanded or forced Defendant to come outside the room. There was no use of force or display of guns when he asked Defendant to step outside. Officer Jenkins and Defendant stepped outside of the motel, using the north door. Defendant consented to a pat down search with negative results. Officer Jenkins testified Defendant was not under arrest, but he told Defendant he was going to be detained based on what was found in the truck. In Officer Jenkins' view, Defendant was not free to leave at that point. Defendant was given *Miranda* warnings and asked if he would agree to answer questions. Defendant stated he really did not have anything to say. When asked what he meant by this, Defendant asked what questions the officers had. In response, they posed the questions they had to the Defendant. Officer Jenkins asked in general about the black ukulele case, what would have been located inside of it and if Defendant had anything inside of the truck. At no time during this conversation did Defendant state he wanted to stop talking to Officer Jenkins or talk to a lawyer. He denied anything found in the truck belonged to him. He admitted he was a convicted felon.

**B.     Officer Jenkins' Body Camera**

Officer Jenkins testified he was wearing a body camera that evening. A portion of the video, from the 15:30 mark to the end of the video, was admitted as government's Exhibit 1. A review of that video demonstrates Officer Jenkins' interaction with Defendant that evening transpired exactly as he testified. The video shows the following: Officer Jenkins knocks on the

door, Defendant comes out of the room and is asked if he wants to step out. The tone of voice used by Officer Jenkins is calm, conversational and deferential. He asks Defendant if he wants to have a conversation with them, as well. The officers are led by Defendant, walking out of the motel. At the door to the outside, Defendant is asked to stop and if he minds if Officer Jenkins gives him a quick pat down. Defendant, in an equally calm, conversational tone responds "sure". After the pat down, Defendant pulls out a cigarette and lights it, as Officer Jenkins tells him he knows the four of them were in the truck. Officer Jenkins tells him he is going to put Defendant in hand cuffs, he is being detained, but not arrested, allows him to continue to smoke his cigarette and apologizes for the small size of the handcuffs.

The video shows Officer Jenkins reading to Defendant his *Miranda* rights and asking him "having those rights in mind, Jake, do you mind if I ask you some questions?" Defendant responds he does not have anything really to say. Officer Jenkins asks him what he means, and Defendant asks Officer Jenkins what questions he has. Officer Jenkins responds he has some questions regarding items they found in the truck. It is a little difficult to hear, but it appears Defendant responds "ok". Officer Jenkins then, in the same calm tone and volume he used during the encounter with Defendant to that point, asks Defendant questions about when and where he got into the truck, about items found in the truck and whether any of those items belonged to him, whether Defendant is a convicted felon, where the occupants of the truck were sitting, and whether he has anything illegal on him.  Defendant answers the questions, denying any of the items in the truck belonged to him, confirms where he was sitting and the location of the black instrument case, denies knowledge of the shotgun found in the truck or possessing anything illegal. At no time in the video does Defendant indicate he does not want to or no longer wants to answer questions, or he wants to speak to an attorney.

Officer Jenkins asks Defendant if he wanted to sit in his squad car due to the low outside temperature and Defendant declines. Eventually, Defendant was transported to the Burlington Police Department for a further interview with the Southeast Iowa Narcotics Task Force. After this interview, he was placed under arrest and transported to the Des Moines County Jail.

### C.   Testimony of Officer Beckman

Officer Beckman also testified. He has been a police officer with the Burlington Police Department since April 2017. He has been the K-9 handler since September 2019 and was assigned Rico in October 2019. Rico is a three-year-old German Shephard from the Netherlands. Officer Beckman received his certification as a K-9 handler through K9 Working Dogs International in Pensacola, Florida in October 2019. He was partnered with Rico at this training which lasted for two weeks, working 12-hour shifts. The Court received government's Exhibit 2, a certification from K9 Working Dogs International stating Officer Beckman and Rico completed a 132-hour training course and have been trained, assessed and evaluated in K-9 patrol, tracking, criminal interdiction and substance detection in single-blind and double-blind hides in controlled environments of marijuana, heroin, cocaine, methamphetamine, psilocybin and MDMA. The certificate further notes Rico does not enter or alert to target odor free "clean" vehicles while conducting sniffs of surrounding free air space. In addition, the certificate indicates the "K9 Team has been evaluated during controlled deployment usage scenarios as per current SCOTUS Case Law and Agency Policy regulations." The certification is valid from October 12, 2019 to February 1, 2021.

Before Rico, Officer Beckman had not worked with a dog in his police work. He also believes the certification from October 2019 was the first certification Rico had received. Officer Beckman indicated he trains with Rico almost every evening by conducting narcotic sniffs at the

police training facility and working on different areas to keep him up to date. Other officers assist in this training, including a deputy with the Des Moines County K-9 unit. Prior to December 18, 2019, Officer Beckman indicated he and Rico have performed quite a few open-air sniffs of vehicles.

Officer Beckman testified when he conducts an open-air sniff with Rico, the types of behavior he is looking for from Rico is whether he exhibits any type of body movement, focuses his nose to a certain area, if his tail wags or becomes stiff or if he turns his body back to an odor. From their training, these actions inform Officer Beckman that Rico is picking up on an odor. As it relates to methamphetamine, this is an odor Rico can detect hours after its use in a car, even if it is no longer in the car. Officer Beckman testified this has occurred previously. Rico is trained in a manner allowing him to alert to vehicles when the doors to it are closed. Officer Beckman testified he conducts the open-air sniff leaving the doors open or closed as he finds them. Officer Beckman has deployment records for Rico and keeps track of those.

Officer Beckman was on duty December 18, 2019 with Rico and responded to a call at the Super 8 Motel at approximately 5:00 a.m.  His experience is the Super 8 Motel was well known for narcotics trafficking, with use, sale and distribution known to occur there.  Officer Jenkins briefed Officer Beckman at the scene and informed him about the methamphetamine pipe and container with suspected methamphetamine residue he placed on the driver's seat. Officer Beckman explained to German he was going to have his K-9 do an open-air sniff on his truck, to which German voiced no concerns.

Officer Beckman walked Rico around the truck, beginning at the rear of the truck on the passenger side. Rico traveled around the front of the truck and did not alert or react until he reached the driver's side. Rico alerted to the truck and attempted to get in the back seat, on the driver's side

of the truck. He is not trained to get into a vehicle for safety purposes, so Officer Beckman stopped him from getting inside the truck. Rico began sniffing again outside of the vehicle and then laid down. This is considered to be Rico's final response, indicating he detected an odor and wants his reward. After this alert, a search was conducted on the truck revealing "a lot" of drug paraphernalia throughout the truck in both the front and back seats. Approximately 212.8 grams of suspected methamphetamine was located, packaged in 7 plastic baggies, packaging material, a digital scale, a red "scooper" with residue and an identification card for Defendant, all in a camouflage backpack. The backpack was closed, so Officer Beckman was required to unzip it and then also open another bag inside of the backpack to discover these items.

Officer Beckman explained a "double-blind" sniff is when neither he, nor Rico, know if there is any contraband in the area. A double-blind sniff prevents Officer Beckman from cueing Rico in any way. His report in this case referred to the open-air sniff he conducted with Rico as a double-blind sniff, even though Officer Beckman was aware of the methamphetamine pipe and container with suspected methamphetamine residue placed on the driver's seat. Officer Beckman testified he believes Rico would have alerted to the truck even if the methamphetamine pipe and container with suspected methamphetamine reside was not on the driver's seat in the truck. He reaches this conclusion because if methamphetamine is used inside a vehicle, the vapors would be all over the vehicle. These vapors will attach to those inside of the vehicle and can also be transmitted to parts of the vehicle touched by those people. A dog can alert to such trace odors weeks later. This happens quite often and if there are no drugs found when the dog alerts, Officer Beckman does not consider this a mistake. In these circumstances, paraphernalia is often found or a person admits to using and this indicates the dog was alerting to the odor, not necessarily on the

amount of contraband found. In this case, Rico alerted to the truck itself, as opposed to a specific object in the truck.

After discovery of the shotgun, but before the search of the backpack, Officer Beckman testified he and Office Jenkins went to speak with Defendant at Room 107. He indicated neither he nor Officer Jenkins pulled their weapons, threatened use of force or used force on Defendant. After Defendant came out of the room, he was detained, and Officer Beckman left to continue to search the vehicle.

## III.    ANALYSIS

Defendant is seeking to suppress the physical items found and seized during the search of the truck, specifically, a loaded, sawed-off, 20-gauge shotgun and shotgun shells in the black instrument case and 212.8 grams of suspected methamphetamine packaged in separate small baggies in the backpack, the testimony of the officers concerning their observation of the physical items found during the search and any testimony concerning statements or admissions by Defendant during his detention, following the search. Dkt. 39. In support of this request, Defendant contends law enforcement did not have reasonable suspicion to stop and seize the truck, the seizure of the truck was illegally extended, probable cause to search the truck was lacking and Defendant's statements were the product of his illegal detention and of a violation of his Fifth Amendment rights. Dkt. 39-1, pp. 3-9 and Dkt. 54, pp. 1-5.

The government resists the motion in each particular. Dkts. 49, 53. The Court addresses each of Defendant's arguments in turn.

### A.    Stop and Seizure of the Truck

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV.  Its requirement that searches and seizures "be founded upon an objective justification" applies

to all seizures, even those "that involve only a brief detention short of traditional arrest." *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (citation omitted). A seizure occurs where law enforcement restrains the liberty of a citizen by either physical force or a show of authority. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1983). Though not implicated in a consensual encounter with law enforcement, Fourth Amendment scrutiny is triggered when the encounter loses its consensual nature and the citizen is no longer free "to disregard the police and go about his business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citing *California v. Hodari D.*, 499 U.S. 621, 628 (1991)); *cf. Michigan v. Chesternut*, 486 U.S. 567, 576 (1988) (holding police conduct "not 'so intimidating' that [the defendant] could reasonably have believed that he was not free to disregard the police presence and go about his business" (citing *INS v. Delgado*, 466 U.S. 210, 216 (1984))).

Absent a warrant, a seizure "must be supported by probable cause or reasonable suspicion." *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013). Probable cause exists where an officer has an objectively reasonable basis to believe a person has violated the law. *Id.* Investigatory stops short of probable cause are appropriate "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) ("Reasonable suspicion exists when an 'officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" (citation omitted)). A "hunch" is not enough. *Terry*, 392 U.S. at 22, 27.

Courts look at the "'totality of the circumstances' of each case to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Though an officer's subjective motivation for the stop is irrelevant, *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006), the circumstances, objectively

viewed, must be still be sufficient to justify the seizure, *Whren v. United States*, 517 U.S. 806, 813

(1996).  What the officer reasonably knew at the time of the seizure, not in hindsight, informs

whether probable cause or reasonable suspicion existed. *See United States v. Hollins*, 685 F.3d

703, 706 (8th Cir. 2012).  The burden is on the Government to prove by a preponderance of the

evidence that probable cause or reasonable suspicion existed to support the seizure.  *See United*

*States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006); *Carter v. United States*, 729 F.2d 935, 940

(8th Cir. 1984) (citing *United States v. Bruton*, 647 F.2d 818, 822 & n. 5 (8th Cir.), *cert. denied*,

454 U.S. 868 (1981)).

The defendant moving to suppress has the burden of proving a reasonable expectation of

privacy in the area searched. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994); *Rakas v.*

*Illinois,* 439 U.S. 128, 130-31 n. 1 (1978); *United States v. Kiser,* 948 F.2d 418, 423 (8th Cir.

1991). We adhere to these cases and to the general rule that Fourth Amendment rights are personal

rights which, like some other constitutional rights, may not be vicariously asserted. *Alderman v.*

*United States*, 394 U.S. 165, 174 (1969); *Simmons v. United States*, 390 U.S. 377, 389 (1968);

*Jones v. United States*, 362 U.S. 257, 261 (1960); c*f. Tileston v. Ullman*, 318 U.S. 44, 46 (1943).

Factors relevant to the determination of standing include: ownership, possession and/or control of

the area searched or item seized; historical use of the property or item; ability to regulate access;

the totality of the circumstances surrounding the search; the existence or nonexistence of a

subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy

considering the specific facts of the case. *Gomez*, 16 F.3d  at 256. If a defendant fails to prove a

sufficiently close connection to the relevant places or objects searched, he has no standing to claim

that they were searched or seized illegally. *Id.*

Defendant contends there was no basis to stop or seize the vehicle in this case. Dkt. 39-1, pp. 3-5. He asserts, under the totality of the circumstances, law enforcement did not have reasonable suspicion of criminal activity in order to seize the truck. Dkt. 54, pp. 1-3. The government argues Defendant does not have standing to challenge the stop and seizure of the truck because the truck did not belong to him. Dkt. 49, pp. 5-7. Even if he does have standing, the government contends law enforcement had "multiple avenues of reasonable suspicion" to seize the truck. Dkt. 53, pp. 3-4.

Regarding standing, this Magistrate Judge finds Defendant lacks standing to challenge the stop or seizure of the truck. Examining the factors from *Gomez* reveal there was no evidence presented the truck at issue belonged to Defendant, he was in possession or control of it, he used the truck in the past or had the ability to regulate access to the truck. Indeed, the evidence presented confirmed German owned the truck and had driven it to the motel. Further, at the time of its seizure, Defendant was neither in the truck or near it, but was inside Room 107 of the motel. Therefore, under the totality of the circumstances, Defendant has not shown he has standing to object to the seizure of the truck.

Regardless, even if he has standing to object, looking at the totality of the circumstances, Officer Jenkins had a particularized and objective basis for having reasonable suspicion of criminal activity. In the first instance, before approaching the truck, Officer Jenkins knew Room 107 was registered to Jennings, Jennings was concerned law enforcement was looking for him, and Officer Jenkins found a methamphetamine pipe in Room 107. The occupants of the truck, which had recently fled the motel after the fire alarm was engaged, were all known to be involved with methamphetamine. This occurred at approximately 4:21 a.m. at a location known for significant drug trafficking in the Burlington area.

In addition, as he approached the truck, Officer Jenkins saw Jennings in the truck and knew Jennings had an active arrest warrant. Prior to arresting Jennings, Officer Jenkins saw him making furtive movements, on or about his person, leaning toward the waistband of his clothing. Searching Jennings, incident to arrest, Officer Jenkins found on Jennings a broken methamphetamine pipe and blue container containing suspected methamphetamine residue.

Based upon the totality of these circumstances, the government has shown by a preponderance of the evidence reasonable suspicion existed to support the seizure of the truck.

### B.      Search of the Truck

Warrantless searches are per se unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41. "Probable cause is determined by the totality of the circumstances, and exists when the facts are sufficient for a reasonable person to believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)). If probable cause justifies the search of a vehicle, then it permits the search of every part of the vehicle and its contents that may conceal the object of the search, including closed containers. *United States v. Stringer*, 739 F.3d 391, 395 (8th Cir. 2014) (discussing the automobile exception to the warrant requirement) (citing *United States v. Ross*, 456 U.S. 798, 825 (1982)).

Probable cause for an automobile search exists if the facts and circumstances known by the police when they began the search were "sufficient in themselves" for a person "of reasonable

caution" to believe that contraband or evidence of criminal activity was in the vehicle. *See Brinegar v. United States,* 338 U.S. 160, 175–76 (1949); *Carroll v. United States,* 267 U.S. 132, 162 (1925). "[A] 'trained officer draws inferences and makes deductions ... that might well elude an untrained person,' and evidence collected 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'" *United States v. Reed,* 882 F.2d 147, 149 (5th Cir. 1989) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)).

We do not examine each fact known by the police in isolation, but rather we consider "the totality of the circumstances" in determining whether probable cause existed for the search. *See Illinois v. Gates,* 462 U.S. 213, 230 (1983). As noted in the previous section, the defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched. *Gomez,* 16 F.3d at 256; *Rakas,* 439 U.S. at 130-31 n. 1; *Kiser,* 948 F.2d at 423. If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally. *Gomez,* 16 F.3d at 256.

In *Rodriguez v. United States*, 575 U.S. 348 (2015), the Supreme Court made clear that the police cannot unreasonably delay the legitimate objects of a traffic stop in order to secure the presence of a canine, because a dog sniff is not an ordinary incident of a traffic stop. *Rodriguez,* 575 U.S. at 356. However, "'[a]s long as a traffic stop is not extended in order for officers to conduct a dog sniff, the dog sniff is lawful.'" *United States v. Harry*, 930 F.3d 1000, 1005 (8th Cir. 2019) (quoting *United States v. Fuehrer*, 844 F.3d 767, 773 (8th Cir. 2016)). Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Rodriguez,* 575 U.S. at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005).

A dog sniff of the exterior of a vehicle does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Caballes*, 543 U.S. at 409–10). "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010), *see United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999); *see also United States v. Perez*, 440 F.3d 363, 374 (6th Cir. 2006). A drug dog is considered reliable when it has been "trained and certified to detect drugs and a detailed account of the dog's track record or education is unnecessary." *United States v. Olivera–Mendez*, 484 F.3d 505, 512 (8th Cir. 2007).

In *Florida v. Harris*, 568 U.S. 237 (2013), the United States Supreme Court outlined the framework courts should use in determining whether a drug dog sniff is reliable enough to give law enforcement officers probable cause to conduct a search. *Harris* 568 U.S. at 246-48; *see United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). The appropriate inquiry is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Harris*, 568 U.S. at 248. The Court noted more emphasis should be placed on a dog's performance in controlled settings than its performance "in the field." *Id.* at 245-246.

The Supreme Court further noted "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id*. at 246. Accordingly, "a court can presume (subject to any conflicting evidence offered) that [a] dog's alert provides probable cause to search" if "a bona fide organization has certified a dog after testing his reliability in a controlled setting ... [or] if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id*. at 247. "This presumption

may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Gonzalez*, 781 F.3d at 429 (citing *Harris*, 568 U.S. at 247-48).

Here, Defendant raises several challenges as to the search of the truck. Defendant argues law enforcement lacked probable cause to search the truck. Dkt. 39-1, p. 6. From Defendant's perspective, the reported "alert" by the search dog was insufficient to establish probable cause. *Id.* Prior to the search, Officer Jenkins placed the methamphetamine pipe and container on the driver's seat, the driver's door remained open during the search and Officer Jenkins told Officer Beckman about the pipe on the driver's seat. *Id.* Defendant also questions the reliability of the drug dog used in this case. *Id.*, pp. 6-7, Dkt. 54, p. 4. He notes no performance records of the dog were produced and the sniff by the dog in this case was not a "double blind" sniff. *Id.*  Under these circumstances, Defendant insists the alert was not reliable. He also suggests there was no reasonable suspicion for extending the seizure of the truck for a dog sniff to be performed. Dkt. 39-1, p. 5, Dkt. 54, p. 3.

The government contends Defendant does not have standing to challenge the search of the truck. Dkt. 49, p. 7. If Defendant established he had a legitimate expectation of privacy in the backpack and the instrument case, then he could challenge the legality of those searches; however, according to Defendant himself, he denied owning anything in the truck. *Id.* If Defendant cannot challenge the legality of the search of the truck, this renders his arguments on whether probable cause existed to search the truck moot. *Id.* at 8. Even if he does have standing to contest the search, the totality of the circumstances provides probable cause to search the truck. Dkt. 53, pp. 7-9. The government also contends law enforcement did not illegally extend the seizure of the truck. Dkt. 53, p. 4.

Addressing the question of standing raised by the government first, this Magistrate Judge determined above Defendant did not have standing to object to the seizure of the truck. For the same reasons, Defendant does not have standing to object to the search of the truck. However, even if he does not have an expectation of privacy relating to the truck, itself, Defendant still may show such an expectation to items in the truck. *See United States v. Macklin,* 902 F.2d 1320, 1330–31 (8th Cir. 1990) (explaining that defendant who lacked standing to challenge search of a third-party's car could still have a legitimate expectation of privacy in luggage located within the car).

Examining the *Gomez* factors set forth above, the backpack and instrument case were left behind, in the truck, away from Defendant's access and control. Defendant denied ownership of these items when he was questioned about them by Officer Jenkins. Further, he did not present any evidence at the hearing on this matter to establish indices of ownership or control of these items. On the other hand, the other individuals in the truck indicated to law enforcement these items were the Defendant's, both items were found in the truck next to where Defendant was sitting, and the backpack contained Defendant's driver's license in a wallet. At least as it relates to the backpack, Defendant appears to have more of an expectation of privacy than with the instrument case.

Regardless, assuming Defendant has standing and an expectation of privacy concerning both the backpack and the instrument case, this Magistrate Judge finds probable cause to search the truck and those items based on the totality of the circumstances, even before the dog sniff. The facts and circumstances known to Officer Jenkins, prior to the dog sniff were "sufficient in themselves" for a person "of reasonable caution" to believe contraband or evidence of criminal activity was in the truck beyond the reason for the seizure of the truck in the first place.

Before searching the truck, law enforcement knew the following: Room 107 at a motel known as a location for drug trafficking, had its fire alarm go off at approximately 4:15 a.m.; the individuals in Room 107 fled the area in the truck before officers arrived; a welfare check in Room 107 revealed a methamphetamine pipe; the room was registered to Jennings, a known methamphetamine user with an active warrant out for his arrest; while Officer Jenkins investigated the fire alarm, Jennings calls the hotel, asking if the police were still there and whether they ran his name; shortly thereafter the truck with the occupants of the room returns; Defendant and German re-enter the motel and are seen near Room 107; Officer Jenkins returns outside, approaching the truck; he sees Jennings making furtive movements inside the truck; Jennings refuses, initially, to obey commands to stop; Jennings is searched and has a methamphetamine pipe in his pocket along with a container with suspected methamphetamine residue inside of it; and the front-seat passenger of the truck, Conrad, is also a known methamphetamine user and has a warrant out for her arrest. The totality of the circumstances shows there was probable cause to search the truck. Further, since probable cause existed prior to the dog sniff, there was no illegal extension of the seizure to allow for a dog sniff as urged by Defendant.  In addition, the positive alert by the drug dog pursuant to the open-air sniff also provides probable cause to search the truck and items found therein.

In that regard, Defendant's challenges to the reliability of the drug dog employed in this case are not persuasive. Here, Rico is a certified drug detection dog, certified for single- and double-blind searches. Ex. 2. His certification notes he does not enter or alert to target odor free "clean" vehicles while conducting sniffs of surrounding free air space. *Id.* Officer Beckman testified to the additional training he conducts with Rico, to keep his skills intact. This is more than sufficient to demonstrate Rico is reliable and law enforcement can trust his alert. A lack of

performance records does not detract from this conclusion given the lesser weight to be provided to such records. Further, Defendant has not demonstrated through cross-examination or expert testimony, inadequacy as to Rico's training or certification.

As it relates to Rico's open-air sniff performed here, the facts surrounding the alert suggest a reasonably prudent person would think a search would reveal contraband or evidence of a crime. Officer Beckman testified while most open-air sniffs are done with a car where its doors are closed, it was not uncommon for open air sniffs to be done with the doors open. In addition, he was credible in testifying based on his training and experience, coupled with the large amounts of paraphernalia and methamphetamine found in the truck, Rico would have positively alerted to the truck, even if the items found on Jennings were removed from the driver's seat where Officer Jenkins had placed them. As Officer Beckman indicated, Rico did not alert specifically to the methamphetamine pipe or the container, but on the truck itself. Also, Rico tried jumping into the rear-driver side seat of the truck where the quantity of methamphetamine was found, which was out of character for him, and not the driver's seat where the pipe and container were located.

For all these reasons, appropriate probable cause existed at the time of the search of the truck and items therein, to believe contraband or evidence of a crime was present, and the 'automobile exception' allowed law enforcement to conduct a warrantless search of the truck and its contents.

### C.   Defendant's Statements

A law enforcement officer may detain an individual for investigation when the officer has a reasonable suspicion, supported by articulable facts, that criminal activity is afoot. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). We consider the totality of the circumstances in determining whether the facts known to the officer amount to an objective and particularized basis for

reasonably suspecting criminal activity. *Id.* at 8. An officer is entitled to draw specific reasonable inferences from the facts in light of his experience. *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

It is well-settled that "'*Miranda* warnings are required when a suspect is interrogated while in custody.'" *United States v. Valquier*, 936 F.3d 781, 784 (8th Cir. 2019) (quoting *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011)). A suspect may waive his *Miranda* rights, provided the waiver is made voluntarily, knowingly, and intelligently. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether a waiver is voluntary, knowing, and intelligent depends on the totality of the circumstances. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). Courts consider the particular facts and circumstances of the case, including the background, experience, and conduct of the suspect. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). The government must prove by a preponderance of the evidence that the suspect waived his *Miranda* rights. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

A person is in custody if "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "Custody" is an objective determination and the term "specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). The inquiry also considers "whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *United States v. Muhlenbruch*, 634 F.3d 987, 995–96 (8th Cir. 2011) (citing *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007).

The Eighth Circuit Court of Appeals identified six factors for consideration in making the custody determination:   (1) whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest; (2) "whether the suspect possessed unrestrained freedom of movement during questioning;" (3) whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities; (4) "whether strong arm tactics or deceptive stratagems were employed during questioning;" (5) whether there was a police-dominated atmosphere; and (6) "whether the suspect was placed under arrest at the termination of the questioning." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004) (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)); *United States v. Muhlenbruch*, 634 F.3d 987, 996 (8th Cir. 2011). "The first three factors tend to mitigate the existence of custody, while the last three tend[] to aggravate it." *Czichray*, 378 F.3d at 827 (quoting *Griffin*, 922 F.2d at 1349 (8th Cir.1990)). The defendant bears the burden of proving custodial status. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

Statements must be voluntary to be admissible. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). Statements to law enforcement are voluntary, for *Miranda* purposes, if they are the result of an "essentially free and unconstrained choice by [their] maker."   *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). "'A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.'"   *United States v. Mshihiri*, 816 F.3d 997, 1004 (8th Cir. 2016) (quoting *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (en banc)).   The test for voluntariness is whether, considering the totality of circumstances, the suspect's will is overborne.   *United States v. Meirovitz,* 918 F.2d 1376, 1379 (8th Cir. 1990).   Courts consider the following characteristics

of the person making the statement when analyzing voluntariness: (1) age; (2) general intelligence and education; (3) whether the person was intoxicated or under the influence; (4) whether the statements were made after being informed of their *Miranda* rights; and (5) whether the person was aware of the protections afforded to suspected criminals by the legal system. *United States v. Chaidez,* 906 F.2d 377, 380–81 (8th Cir. 1991) (citations omitted). The government must show the statements were voluntary by a preponderance of the evidence. *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004).

Here, Defendant maintains his statements to Officer Jenkins should be suppressed as they were a product of an illegal detention. Dkt. 39-1. He contends law enforcement used a continued detention to obtain his statements. *Id.* p. 8. Finally, he argues the government cannot show he waived his *Miranda* rights, voluntarily, knowingly and intelligently. *Id.* p. 9. The government counters Defendant's statement was not a product of illegal detention, he was not in custody for purposes of *Miranda*; regardless, he waived his *Miranda* rights and his statement was not coerced. Dkt. 49, p. 12.

Regarding detention, Defendant was not detained until the sawed-off shotgun was found in the instrument case next to where he had been seated in the truck, law enforcement knocked on the motel room door and asked him to step outside. At that time, law enforcement also had information about another gun being present, with valid concerns it might be in Defendant's possession as the other people in the truck had been searched, and no other gun had been found. For these reasons, at this point, there existed reasonable suspicion to detain Defendant.

This Magistrate Judge further determines that it is not apparent Defendant was in custody for purposes of *Miranda*. Using the *Griffin* factors as a guide, law enforcement knocked on the door to Room 107 and asked Defendant if he would have a conversation with them. He then leads

the officers outside of the motel. Officer Jenkins informed Defendant prior to any questioning of his *Miranda* rights and that he could exercise his rights and choose not to answer any questions. He was also told he was not under arrest. While Defendant did not possess complete freedom of movement during questioning, as he had been placed in handcuffs, he was outside, he was allowed to smoke, and was able to at least move around within the general vicinity of where Officer Jenkins was asking him questions. The tone of the interaction was very calm and conversational. No threats were made to Defendant, nor was he offered any promises or rewards to make a statement. Officer Jenkins initiated contact with Defendant, but the video clearly shows him voluntarily cooperating with Officer Jenkins' request to ask him questions. No coercive or deceptive stratagems used during questioning. The questioning took place outside in the motel parking lot and Defendant was not arrested immediately after questioning ended.

Regardless, even if in custody, the government met its burden of proving Defendant's statements were voluntary.  A review of Defendant's characteristics and the circumstances surrounding the statements suggest those statements were voluntary. Defendant is of middle age or older, who appears to be of appropriate intelligence and education. There is no indication from the video, or otherwise he was intoxicated or under the influence at the time these statements were made. He was advised of his *Miranda* rights before any statements were made and, after receiving the warning specifically asked, "having those rights in mind, Jake, do you mind if I ask you some questions?"  This, along with the other circumstances of the encounter between Defendant and Officer Jenkins described above, demonstrate, under the totality of the circumstances, the government has shown by a preponderance of the evidence Defendant's will was not overborne and his statements were voluntary, knowing and intelligent.

## IV. RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED, Defendant's Motion to Suppress Evidence and Statement and Request for Evidentiary Hearing (Dkt. 39) be denied.

IT IS ORDERED, the parties have until December 29, 2020 to file written objections to the Report and Recommendation, pursuant to pursuant to 20 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b)(2), and L.Cr.R. 59.

**IT IS SO ORDERED.**

**DATED** this 15th day of December, 2020.

_____

STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE